UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| BRADFORD N. OESCH, Individually and as Independent Executor of the Estate of NANCY OESCH, Deceased, and as Next Friend of ANGELA NICOLE OESCH and SAMANTHA RENE OESCH, Minors, and DORIS ROACH,<br><br>    Plaintiffs<br><br>vs.<br><br>WOMAN'S HOSPITAL OF TEXAS, WOMAN'S HOSPITAL OF TEXAS, INC., JAMES MARK McBATH, M.D., MARK McBATH, M.D., P.A., CENTOCOR, INC., CENTOCOR ORTHO BIOTECH, INC., and JOHNSON & JOHNSON, INC.<br><br>    Defendants | C.A. No. 4:11-CV-00770 |

### DEFENDANTS' MOTION TO SEVER

Defendants, Centocor, Inc., Centocor Ortho Biotech Inc., and Johnson & Johnson, file this Motion to Sever as follows:

### SUMMARY OF ARGUMENT

The above Defendants ask this Court to sever the medical malpractice claims from the product liability claims. These Defendants, however, will not only seek to show that this case meets the usual requirements for a severance. Instead, they will show that this case meets the higher standards for a severance under the fraudulent *misjoinder* doctrine. That is, the medical malpractice claims have "no real connection" to the product liability claims.

The differences are stark. The medical malpractice claims arise from two incidents: (i) an allegedly botched surgery on December 10, 2008, that resulted in a perforated bowel and sepsis and (ii) a subsequent incident in which the hospital allegedly failed to provide

oxygen to the decedent 19 days later.  In contrast, the product liability claims are based on a course of treatment with the prescription drug Remicade that started in August 2007 and ended in September 2008—over two months before the surgery.

Plaintiffs attempt to link the malpractice claims to the product liability claims by asserting that the Remicade treatment left Decedent *vulnerable* to infections.  Under Texas law, however, conduct that merely "furnish[es] a condition which made the injury possible" is not the cause of that injury.  Thus, to tie Plaintiffs' product liability claims to decedent's infection and death would require the Court to disregard Texas law.

In addition, the evidence and elements necessary to prove medical malpractice and products liability are completely different.  In fact, the Fifth Circuit previously approved a severance based on the differences between medical malpractice and product liability claims (and also approved a removal based on that severance).

In short, there are no similarities between the medical malpractice and product liability claims.  The time periods, the medical treatments, the doctors involved, and the alleged injuries are all different.  Defendants thus urge the Court to find that the claims are fraudulently misjoined and to sever them.

## REQUESTED RELIEF

Centocor, Inc., Centocor Ortho Biotech Inc., and Johnson & Johnson ask this Court to sever this case into two lawsuits, each with its own cause number, as follows:

(1)   Plaintiffs will assert any claims that they have against Centocor, Inc., Centocor Ortho Biotech Inc., and Johnson & Johnson (collectively the "Product Liability Defendants") in one lawsuit.

(2)   Plaintiffs will assert any claims that they have against Woman's Hospital of Texas, Woman's Hospital of Texas, Inc., James Mark McBath, M.D., and Mark McBath, M.D.,

P.A. (collectively the "Healthcare Defendants") in another lawsuit.

## AUTHORITY TO SEVER

This Court has authority to sever under Rule 21. FED. R. CIV. P. 21 ("The court may also sever any claim against a party."). Federal courts may exercise their authority under Rule 21 in furtherance of their jurisdiction. *See*, *e.g.*, *Wells Fargo Bank, N.A. v. American Gen. Life Ins. Co.*, 670 F. Supp. 2d 555, 567 (N.D. Tex. 2009) ("A district court may dismiss non-diverse defendants under Fed. R. Civ. P. 21 in order to maintain diversity jurisdiction.") (citing *Ralli-Coney, Inc. v. Gates*, 528 F.2d 572 (5th Cir. 1976)).

This Court also has implicit authority to sever under 28 U.S.C. § 1441(b). Specifically, Section 1441(b) allows removal when the parties who are "properly joined" are diverse. *See* 28 U.S.C. § 1441(b). In other words, under Section 1441(b), the Court must determine which parties are "properly joined." It follows that this Court must have the power to dispose of those parties that are fraudulently joined or misjoined, whether by severance or dismissal. *See*, *e.g.*, *Crockett v. R.J. Reynolds Tobacco Co.*, 436 F.3d 529, 532 (5th Cir. 2006) (recognizing that claims against non-diverse parties can be "dismissed on account of fraudulent joinder.").

## STANDARD OF REVIEW

Most federal courts apply state law joinder rules to evaluate joinder in situations similar to this case "because the plaintiffs bring their actions in state court and are required to follow state court joinder rules when they initially file suit …." *Frankland v. State Farm Fire & Cas. Co.*, 2008 WL 4072819, *4 (W.D. La. July 2, 2008) (citations omitted).

The Texas joinder Rule is similar to the federal joinder Rule. *Compare* FED. R. CIV. P. 20 to TEX. R. CIV. PROC. 40. Under the Texas Rule (just like under the federal Rule), a plaintiff must meet two requirements to properly join a defendant:

> All persons may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative any right to relief [1] in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and [2] if any question of law or fact common to all of them will arise in the action.

TEX. R. CIV. P. 40.

This Rule gives the trial court discretion to permit joinder but only if *both* of the requirements are met. *In re Levi Strauss & Co.*, 959 S.W.2d 700, 704 (Tex. App.—El Paso 1998, orig. proceeding) ("[T]he trial court, in its discretion, may allow permissive joinder, <u>but only when both aspects of Rule 40 are satisfied</u>.") (emphasis added); *cf. Demboski v. CSX Transp., Inc.*, 157 F.R.D. 28, 30 (S.D. Miss. 1994) (ordering severance when plaintiffs failed to satisfy one of the two prongs of Federal Rule 20 and not reaching the second prong).

Based on language in the landmark *Tapscott* decision, many courts require the joinder to be particularly improper or even "egregious" whenever a party seeks to remove a case on the basis of improper joinder:

> We do not hold that mere misjoinder is fraudulent joinder, but we do agree with the district court that Appellants' attempt to join these parties is so egregious as to constitute fraudulent joinder.

*Tapscott v. Miss. Dealer Serv. Corp.*, 77 F.3d 1353, 1360 (11th Cir. 1996), *abrogated on other grounds*, *Cohen v. Office Depot, Inc.*, 204 F.3d 1069 (11th Cir. 2000); *see also Wells Fargo*, 670

F. Supp. 2d at 559 ("[T]he connection between the joined parties and claims must be 'so tenuous as to justify disregarding the citizenship of the joined parties.'") (citations omitted).[1]

Even under this "egregious misjoinder" standard, however, courts have found misjoinder when there was "simply no factual connection between the claims." *Wells Fargo*, 670 F. Supp. 2d at 564; *see also Smith v. Nationwide Mut. Ins. Co.*, 286 F. Supp. 2d 777, 781 (S.D. Miss. 2003) (holding that fraudulent misjoinder exists and severance is proper under *Tapscott* when plaintiffs' claims against one set of defendants "have no real connection" to their claims against the other defendants) (emphasis added). This is presumably because the Fifth Circuit has made it clear that actual fraud is not necessary for a finding of improper joinder under *Tapscott*. *See Crockett*, 436 F.3d at 533 ("[J]oinder is improper even if there is no fraud in the pleadings and the plaintiff does have the ability to recover against each of the defendants.") (citing *Tapscott*).

In this Motion, Defendants will show that this case meets the higher standard for fraudulent misjoinder because there is "simply no factual connection between" Plaintiffs' medical malpractice claims and their product liability claims. *Wells Fargo*, 670 F. Supp. 2d at 564.

## ARGUMENT & AUTHORITIES

There are two aspects of this case that show how different the claims against the Product Liability Defendants are from the claims against the Healthcare Defendants. The first is the different elements at issue and the different evidence necessary to prove those elements. In *Crockett*, the Fifth Circuit relied on differences just like these to approve a severance (and to affirm a removal based on that severance).

---

[1] Significantly, a few courts have held that a finding of "egregious" misjoinder is not required. *See Palermo v. Letourneau Technologies, Inc.*, 542 F. Supp. 2d 499, 524-25 (S.D. Miss. 2008) (articulating alternative standard).

The second is that Plaintiffs' claims here arise from two different, clearly identifiable, "series of transactions or occurrences." Literally, the product liability claims arise from (i) a different course of treatment than the alleged malpractice, (ii) by different doctors, (iii) that occurred months earlier, and (iv) that resulted in a different injury.

**I. In *Crockett*, the Fifth Circuit Found Misjoinder of Medical Malpractice and Product Liability Claims.**

In *Crockett*, the Fifth Circuit provided a direct precedent regarding the severability of medical malpractice and product liability claims similar to those here. *See Crockett*, 436 F.3d at 532-33. *Crockett* is particularly relevant because, as the *Wells Fargo* Court explained, in *Crockett*, "the Fifth Circuit … relied on the reasoning of *Tapscott* in allowing removal where it would otherwise be barred." *Wells Fargo*, 670 F. Supp. 2d at 562.

The plaintiffs in *Crockett* brought product liability claims against several tobacco companies, blaming the decedent's cancer on her smoking. *See Crockett*, 436 F.3d at 531. The plaintiffs also claimed that several doctors failed to timely diagnose and treat the cancer. *See id*. Allegedly, the medical malpractice and the decedent's smoking "combined to cause her death." *Id*. Nevertheless, the state trial court severed the malpractice claims from the product liability claims because of the fundamentally different nature of those claims:

> the medical negligence and malpractice claim and the burden of proof to sustain [that] claim is totally different [from] the burden of proof ... necessary to secure judgment for product liability.

*Id*. at 533. The severance created complete diversity, which allowed the tobacco defendants to remove the case. The plaintiffs sought remand, arguing that the severance did not create removal jurisdiction because it violated the so-called "voluntary-involuntary rule."

The Fifth Circuit rejected the plaintiffs' argument in two steps. First, and most importantly for purposes of this Motion, the Court made an explicit finding of improper joinder:

- 6 -

330096 v2

"To the extent the [state court's] severance decision was tantamount to a finding of improper joinder, <u>we agree with that finding</u>." *Id*. (emphasis added). Then, the Fifth Circuit held that the improper joinder justified the removal:

> The fraudulent joinder exception to the voluntary-involuntary rule is designed to prevent plaintiffs from blocking removal by joining nondiverse and/or in-state defendants who should not be parties. <u>That salutary purpose is also served by recognizing an exception to the voluntary-involuntary rule where defendants are improperly, though not fraudulently, joined</u>. We therefore conclude that removal on the basis of an unappealed severance, by a state court, of claims against improperly joined defendants is not subject to the voluntary-involuntary rule.

*Id*. (emphasis added).

In this case, the contrast between the malpractice claims and the product liability claims is even more stark than it was in *Crockett*. Here, the malpractice claims arise from two tragic incidents that have nothing to do with the Remicade treatment. Allegedly, a surgeon perforated the Decedent's small bowel during exploratory surgery on December 10, 2008 (which led to a severe infection and a second surgery on December 12). *See* Original Petition at ¶¶ 18-22. Then, during the decedent's recovery from the infection, the hospital allegedly deprived the Decedent of oxygen, which ultimately resulted in her death. *See id*. at ¶¶ 23-24.

Those facts, of course, implicate the standard of care for the surgeon and hospital staff and will require expert causation testimony about the effect of (1) a tear of the bowel and (2) lack of oxygen on the decedent. *See*, *e.g.*, *Carl J. Battaglia, M.D., P.A. v. Alexander*, 177 S.W.3d 893, 900 (Tex. 2005) (describing the standard of care in malpractice case regarding the treatment of patient who suffered oxygen deprivation during outpatient surgery).

In contrast, here, the Plaintiffs' allegations against the Product Liability Defendants focus on the effect that the prior Remicade treatment had on Plaintiff's immune

330096 v2

system. *See* Original Petition at ¶ 17 ("The drug Remicade is a very dangerous medication that can have serious effects on an individual's immune system."). Plaintiffs claim that the product warnings were inadequate and even assert that the Product Liability Defendants engaged in off-label marketing. *Id.* at ¶¶ 26-27.

These allegations raise different legal issues and will require different evidence. In particular, Plaintiffs mention the so-called "learned intermediary doctrine." *Id.* at ¶ 27. Under that doctrine, Plaintiffs will need to prove that "(1) the warning was defective; and (2) the failure to warn was a producing cause of the plaintiff's condition or injury." *Porterfield v. Ethicon, Inc.*, 183 F.3d 464, 468 (5th Cir. 1999) (applying Texas law). Further, to prove that the warnings were defective, Plaintiffs will need expert testimony from a pharmaceutical warnings expert. *See Hackett v. Searle*, 2002 U.S. Dist. LEXIS 16246, *8 (W.D. Tex. 2002); *Taylor v. TMJ Implants, Inc.*, 1999 WL 351673, *5 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (not designated for publication).

In summary, there is no similarity between the elements necessary to establish these two sets of claims, and, thus, the evidence to prove those claims will be quite different. This Court should thus follow *Crockett* and sever the claims based on "a finding of improper joinder." *Crockett*, 436 F.3d at 533.

**II.    The Product Liability Claims Arise from a Different "Series of Transactions or Occurrences."**

The Court should reach the same decision based on a more detailed review of the elements of Texas Rule 40. As mentioned above, Texas imposes two requirements on plaintiffs who seek to join disparate claims:

> All persons may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative any right to relief [1] in respect of or arising out of the same

> transaction, occurrence, or series of transactions or occurrences and [2] if any question of law or fact common to all of them will arise in the action.

TEX. R. CIV. P. 40. Plaintiffs must meet *both* requirements for the joinder to be proper. *Levi Strauss*, 959 S.W.2d at 704; *cf. Demboski*, 157 F.R.D. at 30.

Plaintiffs cannot meet either requirement. As to the first, the two sets of claims do not arise out of the "same transaction, occurrence, or series of transactions or occurrences." As described above, the medical malpractice claims arise out of a self-contained series of events. *See* Original Petition at ¶¶ 18-22. These events occurred in December 2008. *See id*. The treating doctor was James Mark McBath, M.D., whom the decedent first saw on November 25, 2008. *Id*. at ¶ 18. Dr. McBath performed the critical surgery on December 10, 2008. *Id*. at ¶ 19. Plaintiff was still recovering from the ill effects of that surgery when the hospital allegedly deprived her of oxygen on December 29, 2008. *Id*. at ¶ 23.

In contrast, the claims against the Product Liability Defendants are based on Remicade treatment from <u>August 2007 to September 2008</u>. *See id*. at ¶ 17. A different doctor, Ravi Moparty, M.D., prescribed Remicade. *Id*. In fact, Plaintiffs' Petition implicitly *admits* that this series of events came to a complete stop in September 2008. *See id*. ("The medical and healthcare treatment via the Remicade therapies was not <u>completed</u> until September, 2008, when it was discovered that Nancy Oesch did not have Crohn's Colitis.") (emphasis added).

Plaintiffs try to tie these events together by arguing that the Remicade treatment made the decedent more vulnerable to infections. *See* Original Petition at ¶¶ 17-18 & 20 (alleging that Remicade left Decedent with an "obviously compromised immune system" or an "almost non-existent immune system"). That is, Plaintiffs try to blame the Product Liability

Defendants for the decedent's death—even though her death obviously followed from the deprivation of oxygen on December 29, 2008.

Texas law forecloses that argument.  The Texas Supreme Court has unequivocally held that there is no "[c]ause in fact … if the defendant's negligence did no more than furnish a condition which made the injury possible."  *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995) (citations omitted); *see also IHS Cedars Treatment Ctr. of Desoto v. Mason*, 143 S.W.3d 794, 799 (Tex. 2003) ("Where the initial act of negligence was not the active and efficient cause of plaintiffs' injuries, but merely created the condition by which the second act of negligence could occur, the resulting harm is too attenuated from the [defendant's] conduct to constitute the cause in fact of plaintiffs' injuries.").

The Plaintiffs' causation argument against Remicade is the same causation argument that the Supreme Court rejected in *Doe* and *Mason*.  *See*, *e.g.*, *Givens v. M&S Imaging Partners, L.P.*, 200 S.W.3d 735, 741 (Tex. App.—Texarkana 2006, no pet.).  *Givens* involved negligence that led to a premature birth, which required the newborn to use a breathing tube.  *Id*. at 736-37.  The breathing tube, however, subsequently failed, causing brain damage to the newborn.  *Id*.  The *Givens* Court, "easi[ly]" held that the original negligence was not the cause of the brain damage.  *Id*. at 741; *see generally id*. at 738-41.  "At most, [it] merely created a condition by which one or more subsequent acts of negligence could occur …."  *Id*. at 741. Thus, under *Doe*, *Mason*, and *Givens*, Plaintiffs must rely on a different injury to state a claim against Product Liability Defendants—*e.g.*, their claim that Remicade damaged the Decedent's immune system.

In summary, then, the Plaintiffs' product liability and medical malpractice claims involve (i) different treatments, (ii) by different doctors, (iii) that occurred months apart, and (iv)

that resulted in a different injuries. Under any interpretation of the permissive joinder rule, this means that product liability claims and the medical malpractice claims did not arise from the same "transaction, occurrence, or series of transactions or occurrences." TEX. R. CIV. P. 40.

For example, there is no "logical relationship" between those two claims because there is no common "nucleus of operative fact." *Hanley v. First Investors Corp.*, 151 F.R.D. 76, 79 (E.D. Tex. 1993) (applying the so-called "logical relationship' test and explaining "[t]he thing which makes the relationship 'logical' is some nucleus of operative facts or law …."); *David (Ruby) v. M&E Food Mart, Inc., No. 2, d/b/a Market Basket Stores*, 1995 WL 55306, *2 (E.D. Tex. Jan. 31, 1995) ("When one considers the gap in time between the alleged incidents of harassment, the different identities of harassers, the different outcomes of the complaint, it appears there is no logical link between the David plaintiffs and the later plaintiffs other than they worked at the same store.").

Under a more traditional interpretation of the permissive joinder Rule, it is even clearer that these facts would not meet the first requirement for permissive joinder:

> For example assume 4 automobiles, A, B, C, and D. A and B collide, causing B to strike C, which in turn strikes D, parked at a curb. Here is a series of events which produce multiple claims. However, all possible claims will have stemmed from a common transaction or event, namely the collision of A and B. Further, assume A was at fault in the example; and further assume that 10 minutes earlier on the same highway, A negligently caused a collision involving E. Could it fairly be said that the claims of B, C, and D have any common question of law or fact with E's claim against A? There are separate series of events or transactions.
>
> …. Just as in the illustration, the Court finds that the different crossing accidents did not stem from a common transaction or event, ….

*Demboski*, 157 F.R.D. at 30 (citing illustration from *Sun-X Glass Tinting of Mid-Wisconsin v. Sun-X International, Inc.*, 227 F. Supp. 365 (W.D. Wis. 1964)).

- 11 -

330096 v2

The fact that Plaintiff cannot meet the first prong of Texas Rule 40 is dispositive because both requirements are necessary. But Plaintiffs also fail to meet the second requirement. The medical malpractice claims are legally and factually different than the product liability claims. Specifically, Plaintiffs plead healthcare liability claims against the Healthcare Defendants under chapter 74 of the Texas Civil Practice and Remedies Code. *See*, *e.g.*, Original Petition at ¶¶ 17-24 & 35-37. In contrast, Plaintiffs assert failure to warn claims against the Product Liability Defendants under strict liability and negligence, including purported off-label marketing. *See id.* at ¶¶ 25-28. These legal theories are completely different.

As discussed above, Plaintiffs try to tie these claims together by arguing that the Remicade treatment made the decedent more vulnerable to infection. *See id.* at ¶¶ 17-18 & 20. But, again, Texas law forecloses that argument. Plaintiffs' allegations amount to a claim that Remicade merely "furnish[ed] a condition which made the injury possible." *Doe*, 907 S.W.2d at 477 (citations omitted); *IHS Cedars Treatment Ctr.*, 143 S.W.3d at 799; *Givens*, 200 S.W.3d at 741.

Plaintiffs also try to link the immunosuppressive characteristics of Remicade to their medical malpractice claims. *See generally* Original Petition at ¶ 18 (alleging that Dr. McBath should not have undertaken the exploratory surgery because the decedent's immune system was weak). But Plaintiffs *admit* that Remicade's product label warned about that very risk. *Id.* at ¶ 25. Thus, Plaintiffs must look elsewhere to find overlapping evidence that proves liability against both sets of defendants. *See McNeil v. Wyeth*, 462 F.3d 364, 368 (5th Cir. 2006) ("In prescription drug cases involving the learned intermediary doctrine, however, when 'a warning specifically mentions the circumstances complained of, the warning is adequate as a

matter of law.'") (quoting *Rolen v. Burroughs Wellcome Co.*, 856 S.W.2d 607, 609 (Tex. App.—Waco 1993, writ denied)).

Moreover, the immunosuppressive effects of the Remicade treatment (which ended over two months before the surgery) are peripheral to the medical malpractice claims in light of the allegations of blatant malpractice—*i.e.*, the botched surgery and the hospital's failure to provide oxygen to the decedent. *See Levi Strauss*, 959 S.W.2d at 703 ("Rule 40 … contemplates combining causes of action if the facts and legal issues are <u>essentially identical</u>, so long as the judicial economy and convenience outweigh potential prejudice.") (emphasis added).

In any event, the Plaintiffs must meet both requirements of Texas Rule 40 to join disparate claims. *Levi Strauss*, 959 S.W.2d at 704 ("The trial court has <u>no discretion</u> to permit joinder under Rule 40 where, as here, both elements are not satisfied.") (emphasis added). Thus, even if the immunosuppressive qualities of Remicade were held to constitute a "question of … fact common to all of [the claims]," severance would still be necessary under the first prong of Rule 40—because the claims do not arise out of the same "series of transactions or occurrences." *See* TEX. R. CIV. P. 40. Permissive joinder was thus not available under Texas law, and this Court should sever.

## PRAYER

In light of the foregoing, the Product Liability Defendants ask this Court to sever this case into two lawsuits, each with its own cause number, such that (1) Plaintiffs will assert any claims that they have against Centocor, Inc., Centocor Ortho Biotech Inc., and Johnson & Johnson in one lawsuit, and (2) Plaintiffs will assert any claims that they have against Woman's Hospital of Texas, Woman's Hospital of Texas, Inc., James Mark McBath, M.D., and Mark McBath, M.D., P.A. in another lawsuit. The Product Liability Defendants further ask this Court

to retain jurisdiction over Plaintiffs' claims against the Product Liability Defendants for all further proceedings.

>Respectfully submitted,
>
>By: */s/ Kathleen A. Frazier*
>GENE M. WILLIAMS
>ATTORNEY-IN-CHARGE
>S.D. Tex. No. 1328
>Texas State Bar No. 21535300
>E-Mail:  gmwilliams@shb.com
>MANUEL LÓPEZ
>S.D. Tex. No. 15843
>Texas Bar No. 00784495
>E-Mail:  dmlopez@shb.com
>KATHLEEN A. FRAZIER
>S.D. Tex. No. 38952
>Texas State Bar No. 24043663
>E-Mail:  kfrazier@shb.com
>SHOOK, HARDY & BACON L.L.P.
>JP Morgan Chase Tower
>600 Travis, Suite 1600
>Houston, TX   77002-2992
>Telephone:  (713) 227-8008
>Telefax:  (713) 227-9508
>
>ATTORNEYS FOR DEFENDANTS
>CENTOCOR, INC., CENTOCOR
>ORTHO BIOTECH INC., AND
>JOHNSON & JOHNSON

## CERTIFICATE OF CONFERENCE

I hereby certify that I conferred with J. Craig Lewis, counsel for plaintiffs, regarding Stryker's Motion to Sever, but the parties were unable to reach an agreement regarding the Motion.

>*/s/ Kathleen A. Frazier*
>KATHLEEN A. FRAZIER

## CERTIFICATE OF SERVICE

I certify that a copy of the above and foregoing DEFENDANTS' MOTION TO SEVER was served in accordance with the Federal Rules of Civil Procedure on this the 18th day of March, 2011, as indicated below:

J. Craig Lewis
John J. Brothers
THE LEWIS LAW FIRM
2905 Sackett Street
Houston, TX   77098
*Via 1st Class United States Mail*

*Attorneys for Plaintiffs*

Andrew J. Lehrman
*Via E-Mail @ alehrman@albmlaw.com*
Jordan M. Anderson
*Via E-Mail @ janderson@albmlaw.com*
ANDERSON, LEHRMAN, BARRE & MARAIST, L.L.P.
Gaslight Square
1001 Third Street, Suite 1
Corpus Christi, TX   78404

*Attorneys for Defendants,*
*James Mark McBath, M.D. and*
*Mark McBath, M.D., P.A.*

John S. Serpe
*Via E-Mail @ jserpe@serpejones.com*
Nicole G. Andrews
*Via E-Mail @ nandrews@serpejones.com*
William H. Whitaker
*Via E-Mail @ wwhitaker@serpejones.com*
SERPE, JONES, ANDREWS, CALLENDER & BELL, PLLC
Three Allen Center
333 Clay Street, Suite 3485
Houston, TX   77002

*Attorneys for Defendant, CHCA Woman's Hospital, L.P. d/b/a The Woman's Hospital of Texas*

> */s/ Kathleen A. Frazier*
> KATHLEEN A. FRAZIER

330096 v2